# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-236-2 (RC)** |
| **NATHAN BAER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Nathan Baer to 11 months of incarceration (the midpoint of the Guidelines range as calculated by the Government), 36 months of supervised release, $2,000 in restitution, and a mandatory special assessment of $100.

## I.      INTRODUCTION

The defendant, Nathan Baer, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9

Baer, who is self-employed as the owner of a company that provides excavation and irrigation services, was 41 at the time of the offense. Baer was part of the mob that overran the West Plaza on the Capitol grounds. When the mob breached the police line, Baer joined the rioters in the Lower West Terrace tunnel, which was the site of the most violent clashes on January 6. In the tunnel, Baer participated in at least four heave-ho efforts, where rioters joined collectively to push against the police line that was guarding the entrance to the building. He also passed police riot shields to other rioters and away from the police, diminishing the officers' ability to protect themselves from the violent mob. While Baer was in and around the tunnel, he was cheering on his fellow rioters. Baer later lied to the FBI in a post-arrest interview where he stated that he was inside the tunnel to help other rioters who had been hurt.

The Government recommends that the Court sentence Baer to 11 months of incarceration. This sentence reflects the gravity of Baer's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The Government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 41, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

At approximately 2:30 p.m., significant sections of the police line on and near the United

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

States Capitol's Lower West Terrace broke as the rioters in the crowd swarmed and overwhelmed the law enforcement officers. Some of the rioters were able to penetrate the scaffolding, a position that gave them access to the stairs to the upper terraces where there are several key doors, including the doorway to the Lower West Terrace, also referred to as the "tunnel." Officers from the USCP and the Washington, D.C. Metropolitan Police Department (MPD) formed a police line in the tunnel blocking that entrance to the United States Capitol building and were repeatedly fending off assaults by some of the rioters. At approximately 2:42 p.m., rioters began entering the tunnel and ambushing the officers. The rioters broke the glass and forced the doors open. In response, the USCP and MPD officers formed a police line blocking that entrance to the U.S. Capitol building. From approximately 2:42 p.m. and on, numerous rioters were consistently attempting to breach the police line that formed in the tunnel. The rioters used various weapons, as well as the force of their bodies, in an attempt to overcome the officers. Many of the rioters assaulted MPD and USCP officers by hurling objects towards the officers, physically striking officers with batons and other blunt instruments, using lights to distract and disorient the officers, using electrical shock devices, crushing officers between the doors and walls of the confined space, and by deploying chemical sprays and fire extinguishers against the officers.



*Image 1: West Front of the Capitol.*

**B.      Baer's Role in the January 6, 2021, Attack on the Capitol**

On January 5, 2021, Baer traveled to Washington, D.C. On the morning of January 6, 2021, Baer attended the "Stop the Steal" rally near the Washington Monument, where he heard former President Trump's speech. He walked from the rally to Capitol grounds, where they entered on the West Front.

At approximately 2:17 p.m., Baer climbed onto the north scaffolding, where he could see the mob that had gathered. He remained there for approximately 25 minutes, during which he waved a red hat at the sea of rioters below him.

4



*Image 2: Baer climbing the north side scaffolding.*



*Image 3: Baer waving a red hat while on the north side scaffolding.*



*Image 4: Baer waving a red hat while on the north side scaffolding.*

At approximately 2:42 p.m., Baer climbed down from the scaffolding and made his way to the Lower West Terrace. At approximately 2:50 p.m., Baer was at the entrance of the tunnel. At this point, rioters inside the tunnel collectively pushed together in a "heave-ho" effort against the police line until at about 2:51 p.m., when the mob appeared to have lost its momentum and dissipated backward. During this time, Baer cheered on the rioters who were inside the tunnel.



*Image 5: Baer cheering at the entrance of the tunnel while rioters inside the tunnel participate in a heave-ho effort against the police line.*

From the vantage point at the mouth of the tunnel, and particularly given his height of 6'2", Baer could see the large formation of police officers—who were positioned beyond the crowd of rioters—defending an entrance to the Capitol Building, and could hear the door alarm from the emergency exit blaring.

At approximately 2:57 p.m., Baer entered the tunnel, but did not make it far, because law enforcement sprayed OC spray toward the rioters, causing many rioters to turn around and exit the tunnel. Baer remained at the mouth of the tunnel, with the capability to leave the premises. Despite this, he entered the tunnel at approximately 3:02 p.m.

At approximately 3:03, the rioters in the tunnel initiated another heave-ho effort, their bodies moving in unison back-and-forth to apply force against the police line ahead. Baer participated in this effort, pushing his body against the rioters in front of him with so much force that he had to brace himself by putting his hand on the tunnel wall. *See* Exhibit 1 at 14:40 to 15:10.

7



*Image 6: Baer during a heave-ho effort, bracing himself by putting his hand on the tunnel wall.*

At approximately 3:04 p.m., the police deployed OC spray to disperse the rioters, and many turned around to exit the tunnel as a result. Baer, however, stayed inside.

At approximately 3:07, Baer handed a police shield up to the rioters closest to the police line, who were using the shields both defensively and offensively against the police. Approximately 30 seconds later, Baer handed up another police shield. *See* Exhibit 1 at 18:04 to 18:40.



*Image 7: Baer (green) handing up a police shield (blue) to the rioters in front of him, toward the police line.*

At approximately 3:08 p.m., Baer participated in another heave-ho effort, pushing his body against the rioters in front of him in unison with them, with the aim of overcoming the police line ahead of them. This effort was short-lived, lasting only around 30 seconds. *See* Exhibit 1 at 19:10 to 19:50. Baer exited the tunnel around 3:11 p.m., staying at the mouth of the tunnel.

About 30 seconds later, another heave-ho effort began in front of Baer, and he walked back into the tunnel to join the effort, pushing forcefully on the rioters in front of him, and participating in the back-and-forth movement. The rioters together were yelling "Heave! Ho!" as they moved back-and-forth to overcome the police. *See* Exhibit 1 at 22:46 to 23:12 and Exhibit 2 at 00:00 to 00:20.

9



*Image 8: Still image from a journalist's footage capturing Baer participating in a heave-ho effort at approximately 3:12:04 p.m.*

At approximately 3:14 p.m., Baer handed up another police shield to the rioters in front of him.



*Image 9: Baer (green) handing up a police shield (blue) to the rioters in front of him, toward the police line.*

10

Baer then continued to force his way toward the police line. A journalist's footage captured Baer almost at the front of the line of rioters, very close to the doors to the Capitol building, at approximately 3:16 p.m. There, he briefly participated in a fourth heave-ho effort. *See* Exhibit 2 at 04:10 to 04:18.



*Image 10: Still image from a journalist's footage capturing Baer at the front of the line of rioters at approximately 3:16 p.m., with the doors to the Capitol building at the left part of the frame.*

At approximately 3:18, the police line began to advance, in an effort to push the rioters from the tunnel. Baer was at the very front of the police line as they pushed the rioters out. The police were physically pushing the rioters out of the tunnel; the rioters, including Baer, were resisting the police line's effort.



*Image 11: Baer being pushed out of the tunnel by the police (yellow).*

Although the police were able to clear the tunnel during this push forward, it was at this point that another rioter abducted MPD Officer Fanone, pulling him out of the tunnel and into the mob. Baer exited the tunnel at approximately 3:19 p.m., and was right next to Officer Fanone, as he was being assaulted by rioters.[2]

---

[2]  The Government does not have evidence that Baer participated in the assault on Officer Fanone.



*Image 12: Baer directly in front of Officer Fanone when another rioter abducted him from the police line and pulled him into the mob.*

Baer remained outside the tunnel until at least 3:22 p.m. He had multiple opportunities to leave Capitol grounds, but nevertheless stayed to obstruct the police.

### *Baer's Pre-Sentencing Statement*

On August 8, 2024, the FBI interviewed Baer with his attorney present, pursuant to the terms of the plea agreement.

Baer stated that he drove alone to Washington, D.C. on January 5, 2021. On January 6, 2021, he attended the "Stop the Steal" rally near the Washington Monument. He then walked to the Capitol with the understanding that there would be a peaceful protest there, where people would be singing and praying. However, once he arrived on Capitol grounds, he was heartbroken to see that there were people being violent, and that there were confrontations between police and those he referred to as protestors.

When asked why he climbed the north side scaffolding, Baer could not provide a clear

answer, but stated that he had hoped that there would be a big sit-in, and that everyone could gather and calmly be there. He said he admired Ghandi's work of passive resistance. He stated that while he was on the scaffolding, he saw people using force against the police, and he saw the police throwing grenades and flash bangs into the crowd. He acknowledged that given the number of people in the crowd, the situation had to have been scary for the police.

Baer stated that he had no intention of crossing a police barrier, crossing a line, or entering the Capitol, but there came a point where everything went wrong because things became more violent. He described the situation as the police and those present were behaving in a way that was antagonistic toward each other, and Baer did not believe that was right.

Baer stated that he entered the tunnel because he wanted to offer help to those in need, which included people who had been exposed to pepper spray, who he could see were in a lot of pain. He saw his actions as standing up for those who needed aid. He denied that he took riot shields away from the police.

Baer admitted participating in the heave-ho efforts, saying that his participation was unfortunate, but that he did not push with his full force, and the push was half-hearted. He did not view these actions as violent, and stated he could not see what was happening at the very front. He said that when he reached the front of the crowd, he was overwhelmed, and saw a woman who was crying, and he offered to help her leave the tunnel.

At that point, the police began pushing everyone out of the tunnel, and Baer found himself next to Officer Fanone. Officer Fanone, looked terrified, so Baer told him, "It's ok, we won't hurt you." Baer peeled away from Officer Fanone, farther into the crowd that was outside of the tunnel. When he saw that Officer Fanone had been returned to the police line, he cheered.

14

Baer stayed outside the tunnel for about ten to fifteen more minutes, and then left Capitol grounds. He left D.C. the next morning.

Baer stated that he was very sorry about his participation in January 6, and that he wished he had been turned away, or that the situation would have been peaceful or prayerful. He stated that he was sorry that he was in a place where his actions could have hurt someone.

### III.    THE CHARGES AND PLEA AGREEMENT

On July 19, 2023, a federal grand jury returned an indictment charging Baer with five counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). On April 5, 2024, Baer was convicted of this offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Baer now faces sentencing on Civil Disorder, 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Baer faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution of $2,000, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the PSR's Guidelines calculations:

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Special Offense Characteristic: Physical Contact | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| | **Total** | **11** |

**A.  The three-level special offense characteristic for physical contact applies.**

The Probation Office correctly recommends the three-level enhancement for physical contact under U.S.S.G. § 2A2.4(b)(1)(A). PSR ¶ 49.

Baer joined with a group of other rioters in at least four separate collective "heave-ho" pushes against a line of law enforcement officers in the Lower West Terrace tunnel who were attempting to restrain the crowd. *See* Statement of Offense, ECF No. 41, ¶¶ 10, 13, 14. Baer's participation in the collective pushes was both intentional and deliberate, as he exited and re-entered the tunnel repeatedly to participate in these heave-ho efforts. The guidelines do not require that the defendant himself make physical contact with his victim, only that the offense be designed to cause physical contact. *See e.g., United States v. Taliaferro*, 211 F.3d 412, 415–16 (7th Cir. 2000) ("physical contact" under § 2A2.4(b)(1) includes throwing a cup of urine at a prison guard because the law of battery has long included indirect acts such as spitting). In this case, Baer's intended target was the police line and his physical energy, as well as the collective energy of his co-defendant and the other rioters in the tunnel, was directed at forcibly pushing those officers out of the way. Because he was aiding and abetting an effort to push these officers, and the officers felt the result of that physical force, Baer's offense involved physical contact.

Under similar circumstances, Judge Nichols applied the three-level physical contact enhancement in *United States v. Kumer*, 23-cr-237 (CJN), where the defendant joined in at least

three separate collective "heave-ho" pushes against the police line in the tunnel. One of these pushes resulted in injury to a police officer. Although the defendant did not make direct physical contact with any police officer, the Court applied the enhancement.

Judge McFadden applied the three-level enhancement in *United States v. Crowley*, 23-cr-45 (TNM), where the defendant engaged in multiple heave-ho efforts and pushed police officers in the tunnel. Although the situation in the instant case is slightly different, the government takes the position that Baer's knowing and active participation in the collective effort of multiple rioters pushing together against a police line amounts to physical contact intended to impede the officers' ability to perform their duties.

### B.  The Court should not apply the two-level decrease pursuant to Section 4C1.1.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 is in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

The Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 59. It nevertheless did not apply the two-level decrease pursuant to § 4C1.1, because Baer used violence in the instant offense. PSR ¶ 55. The Court should do the same here.

Baer is not eligible for this decrease because he used violence or credible threats of violence in connection with the offense. *See* U.S.S.G. § 4C1.1(3). Judge McFadden defined violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF No. 195 at 4-5. Judge McFadden also defined it as "the "exertion of any physical force so as to

17

injure or abuse." *Id.*; *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF No. 65 at 5

(adopting Judge McFadden's definition of violence from *Bauer*).

Judge McFadden defined the credible threat of force as "a believable expression of an

intention to use physical force to inflict harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF

No. 195 at 6. When examining whether Baer's conduct posed a credible threat of violence, the

Court must consider the totality of the circumstances surrounding that conduct:

> In evaluating whether credible threats of violence were posed by the defendant's
> offense conduct, to my mind, the context matters very critically. In other words,
> evaluating a defendant's offense conduct requires examination of all the factors of
> the offense including what the particular defendant being sentenced did; where he
> was; what he was seeing; what a person would reasonably understand was the
> volatility of the situation; the threat that whole situation would pose to others; the
> foreseeable harm of the situation; and the consequences of the specific defendant's
> individualized actions. So the fact that this defendant is not personally charged with
> assaulting or attacking officers is, therefore, not sufficient to make him eligible for
> the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

The Government is aware that in *Crowley*, Judge McFadden ruled that the defendant's

pushing in the tunnel was not violent, and that a credible threat of violence had to amount to more

than mere presence in tunnel. Although the Government agrees that mere presence is not sufficient,

it disagrees with the Court's ruling in *Crowley*. In *Crowley*, in ruling that the defendant's conduct

was not a credible threat to violence, Judge McFadden cited the Sixth Circuit's decision in *United

States v. Pineda-Duarte*, 933 F.3d 519 (6th Cir. 2019), that a credible threat of violence, pursuant

to U.S.S.G. § 2D1.1(b)(2), required the defendant to have the intent to injure another, and that the

intent must be credibly communicated. *United States v. Pineda-Duarte*, 933 F.3d at 522. Here,

Baer participated in multiple heave-ho efforts, with the aim of overwhelming the police line

through its sheer force of numbers. The rioters yelled together, "Heave! Ho!" as they pushed

against the police line, communicating their intent to physically overpower the police. This is both violence and a credible threat of violence that disqualifies Baer from the two-level decrease under U.S.S.G. § 4C1.1.

The Government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants. Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the Government submits that, even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the Government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

Accordingly, based on the Government's calculation of the Baer's total adjusted offense level, after acceptance of responsibility, at 11, Baer's Guidelines imprisonment range is 8 to 14 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The Government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Baer's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

In the tunnel, Baer participated in at least four heave-ho efforts, where rioters joined collectively to push against the police line that was guarding the entrance to the building. He also passed police riot shields to the rioters and away from the police, diminishing the officers' ability to protect themselves from the violent mob. Baer entered and exited the tunnel various times, including at one point where the police deployed OC spray to get Baer and the other rioters out of the tunnel. Baer had multiple opportunities to leave Capitol grounds, but nevertheless stayed to obstruct the police.

The nature and circumstances of Baer's offense were of the utmost seriousness, and fully support the Government's recommended midpoint sentence of 11 months of incarceration.

### C.  The History and Characteristics of the Defendant

Baer has no criminal history, is employed, and pleaded guilty quickly after he was arraigned.

Despite this, Baer minimized his conduct and lied to the FBI during his post-arrest interview. Baer claimed that he went to the Capitol expecting to participate in a peaceful protest, despite the fact that he eagerly participated in and cheered on violence against the police. Baer attempted to paint himself as someone who was helping both the rioters and the police, when, in

truth, he impeded the police's ability to defend themselves, the Capitol, and the members of Congress inside the Capitol. Baer insisted that he never took riot shields away from the police, and although that is technically true, his statement does not capture the spirit of his conduct. Baer passed riot shields to the rioters at the front of the police line, so that those rioters could use them to thwart police efforts to stop and disperse the mob. In contrast to Baer's claims, his actions did nothing to help the police.

      **C.**      **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Baer's criminal conduct on January 6 was the epitome of disrespect for the law.

      **D.**      **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Despite the fact that Baer told the FBI that he went to the Capitol expecting to participate in a peaceful protest, he quickly pivoted and participated in

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

and cheered on violence against the police. This, combined with the fact that Baer expressed remorse only after he was arrested, indicates that Baer repeatedly prioritized his interests over those of law enforcement.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious,

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Kumer*, 23-cr-237 (CJN), is one such case. There, Kumer and his mother pushed into the tunnel, where they remained for almost 25 minutes. During this time, Kumer joined the rest of the crowd in the tunnel and pushed in unison against the police line. At one point, as he pushed hard with his back toward the police, he called out encouragement to other rioters, saying, "LET'S GO! C'MON! LET'S GO!" Even after he was removed from the tunnel, Kumer remained on the Inaugural Stage near the police line for several more minutes. Kumer pleaded guilty to a violation of 18 U.S.C. § 231(a)(3). Like Baer, he fell into criminal history Category I. His Guidelines range was 12 to 18 months. One of the pushes in which Kumer was involved resulted in bodily injury to a police officer, so the parties agreed to a two-level enhancement. Judge Nichols sentenced him to 15 months of incarceration. Although it is not alleged that Baer's pushes caused bodily injury to an officer, Baer spent more time in and around the tunnel than Kumer did, and,

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

like Kumer, cheered for and encouraged his fellow rioters. This Court should similarly impose a sentence at the midpoint of the Guidelines range.

In *United States v. Shawn Price*, 22-CR-106 (CJN), Price pushed against fellow rioters who pushed up against the police line on the West Plaza. Price interfered with officers on at least two different occasions on the West Plaza within the span of approximately five minutes. After January 6, like Baer, Price minimized his conduct in an interview with the FBI. Price ultimately pleaded guilty to a violation of 18 U.S.C. § 231(a)(3). Price fell into criminal history Category III. His Guidelines range was 12 to 18 months. Judge Nichols sentenced him to 12 months of incarceration. Baer's approximately 33 minutes and around the tunnel (in contrast to Price's five minutes) and four separate push efforts (in contrast to Price's two) against the police line warrant a sentence at the midpoint of the range.

Finally, in *United States v. Roger Baugh*, 22-CR-313 (JEB), Baugh engaged in several heave-ho pushes against the police, like Baer. Baugh was also dishonest with the FBI. Baugh pleaded guilty to a violation of 18 U.S.C. § 231(a)(3) and had a Guidelines range of 8 to 14 months. Like Baer, Baugh fell into criminal history Category I. Judge Boasberg sentenced Baugh to 12 months and 1 day of incarceration, above the midpoint of the Guidelines range.

While no one case is a perfect match—and thus why §3553(a)(6) is only one part of the inquiry—the comparators suggest that a midpoint sentence is appropriate.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Baer must pay $2,000 in restitution, which reflects in part the

role Baer played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects,

the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a

figure based on loss estimates supplied by the Architect of the Capitol and other governmental

agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been

updated by the Architect of the Capitol, USCP, and MPD.) Baer's restitution payment must be

made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and

other victim entities. *See* PSR ¶ 148.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the Government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

Baer's conviction for violating 18 U.S.C. § 231(a)(3) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). The guidelines fine range here, for offense level 11, is $4,000 to $40,000. U.S.S.G. § 5E1.2(c). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the PSR concludes that Baer does not have the ability to pay both restitution and a fine. PSR ¶ 125.

## IX.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of 11 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
NY Bar No. 5226121
(202) 803-1612
Carolina.Nevin@usdoj.gov