**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:23-cr-00236-02 (RC)** |
| | : | |
| **NATHAN BAER,** | : | |
| | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM**

Nathan Baer respectfully requests that this Honorable Court sentence him to a period of thirty days of home detention to be followed by a period supervised release. Such a sentence will allow him to continue to work and is justified by his sincere remorse about his conduct on January 6th and his law-abiding nature before and since that day.

Nathan Baer was one of the first January 6th clients for the federal defender offices. Soon after he saw his face appear in news articles, he began to research what he was supposed to do. He was told there was no case against him, but he persevered. His efforts led him to call the Federal Public Defender office on January 19, 2021.

When he first spoke to counsel, Mr. Baer wasn't interested in avoiding jail or finding the best plea. He had seen articles and postings on the internet that attributed to him the attack on Officer Michael Fanone. He had been pictured with Officer Fanone and it had been revealed that Officer Fanone had been tased and suffered from a heart attack. Across the country, many assumed it was Mr. Baer

who had attacked the officer and Mr. Baer was anxious and desperate to correct that misinformation.   Mr. Baer told counsel that while he was right beside Officer Fanone, that he tried to help him up.   That he told him "Don't worry.   We won't hurt you."   Mr. Baer was embarrassed that he was associated with the riot, but especially this aspect of the riot.   Mr. Baer has a long history of supporting and respecting law enforcement.   He also sees himself as a non-violent person and was disgusted by many of the images from January 6th – even while recognizing that some of that conduct occurred not far from where he was.

He told counsel that he while he was inside the tunnel at the Lower West Terrace, he never went inside the building.   He insisted that he had come only to protest peacefully and that he ended up in the tunnel because he was concerned about the violence that seemed to be fomenting.   He had reached out to get an attorney so that he could contact the Department of Justice to identify himself and eventually turn himself in.   And that is what happened – but the government soon correctly determined that Mr. Baer did not attack or help anyone attack Officer Fanone.   He was charged over two years later with Civil Disorder.   He pleaded guilty, ashamed for even being present that day, and more specifically, recognizing that he was part of a larger group of individuals that had faced off with the police.

While he did not, by any means, share the intent of others around him, he acknowledges that there were times when he pushed up against those that were pushing police officers and that he had, for a few seconds, participated when people

2

were shouting "heave ho!"

It is important to note, however, that Mr. Baer was conflicted throughout his time at the Capitol and that was demonstrated by his actions and lack of actions. Video evidence corroborates that he attempted to help Officer Fanone.   Exh. B. Video also shows him berate a rioter named David Judd, who threw a firecracker towards the police.   (He yells at him, "What the fuck!   You're going to do something like that and just run away? Exh A). He never crosses the threshold into the building. He did not assist in rioters taking shields away from the police, though he did take the opportunity to pass the riot shields back towards the police line.   He never assaulted anyone, encouraged anyone to engage in violent conduct and attempted to help others, to include protestors and officers, around him when needed.

From discussions with Mr. Baer, he is still trying to process everything that happened on that day.   Unlike many other January 6th defendants, he does not shy away from the uncomfortable.   He has been dutifully going to therapy (Ex Q) and agrees that he does not understand everything that brought him to January 6th and prevented him from leaving immediately.   But he knows that he is making progress towards that goal.   He knows that he is deeply remorseful for his actions.   He knows that he will never place himself in that kind of situation again.

**Argument**

**I.      The Appropriate Guideline Range for Mr. Baer is 0-6 months.**

The Probation Office incorrectly assesses Mr. Baer's guideline range.   First,

the probation office improperly applied the "physical contact" enhancement under USSG. §2A2.4(a).   Second, the probation office neglected to apply the zero-point offender adjustment under USSG §4C1.1(a)(3).   Mr. Baer is properly under Offense Level 6 and Criminal History Category I.   Thus, his proper guideline range is 0 to 6 months.

### A. USSG §2A2.4(a) does not apply to indirect contact through multiple layers of people

Unlike Mr. Baer, the individuals who received the physical contact enhancement, over objection, did so because they were near the front of the line, yelling "Heave ho!" or "Traitors!" or otherwise demonstrated that their actions were directed, physically, at law enforcement.   Mr. Baer did none of these things.

A survey of Civil Disorder offenses reveal three categories of cases involving 2A2.4(a):   First, there are the cases where the government does not seek the physical contact enhancement. Second, there are cases where the parties agreed to the enhancement as part of a plea agreement.   Third, as here, there are cases where the parties have agreed to leave the question of application of the enhancement to the Court.   Within the third category, the physical contact enhancement is applied where the defendant actually assaults the officer or where individuals were near or at the front of the line facing police with intent to breach the police line.   Mr. Baer was never near the tunnel doors at the times people were pushing and he had no

4

intent to go inside the building.[1]

## B. The cases where the physical contact enhancement have been applied have required more than what Mr. Baer did

First, as noted above, the government has been uneven in even arguing the physical contact enhancement, creating unwarranted disparities. The Court should thus weigh the government's arbitrary application of 2A2.4 and reject its arguments here.

In addition, the government has been unsuccessful in several cases where defendants have challenged and litigated the physical contact enhancement, primarily in situations similar to Mr. Baer's where there was no actual physical contact. The majority of these cases require evidence beyond what the government has produced against Mr. Baer.

For example, Judge Mehta grappled with the requirement of direct physical contact in sentencing Sandra Parker and her codefendant William Isaacs, 21-cr-028. The court noted that Mr. Isaacs "likely would have made physical contact" with officers at various points so applied 2A2.4(b). However, when Ms. Parker was

---

[1] For example, the government did not appear to request the enhancement in cases involving the same tunnel in *United States v. Cantwell,* 21-cr-89; *United States v. Grayson*, 21-cr-224, *United States v. Johnson (Daryl) and Johnson (Daniel)*, 21-cr-407, *United States v. Stetcher*, 21-cr-720.

Cases where the defense waived the issue by **agreeing** to the enhancement as part of the plea agreement include: *United States v. Bourne,* 23-cr-35, ECF No. 141 at 3; *United States v. Preller,* 23-cr-45, ECF No. 71 at 2; *United States v. Cole*, 23-cr-113, ECF No. 75 at 2; *United States v. Rockhold,* 23-cr-104, ECF No. 64 at 2; *United States v. St. Onge,* 23-cr-237-2, ECF No. 100 at 3; *United States v. Yates,* 23-cr-372-1, *United States v. Kumer* 23-cr-237-3, ECF No. 103 at 3; *United States v. Price,* 22-cr-106, ECF No.37 at 3; *United States v. Baugh*, 22-cr-313-1, ECF No. 7 at 3; *United States v. Nolf*, 23-cr-162-2, ECF No. 45 at 3; *United States v. Yang*, 23-cr-100, ECF No. 25 at 3.

sentenced, the court declined to apply the enhancement, reasoning, "I don't have evidence [that Ms. Parker] would have made physical contact with a police officer." Judge Mehta applied a bright line rule that required actual contact.

In *United States v. Hazleton¸* 21-cr-030, Judge Bates considered and rejected the application of 2A2.4.   Judge Bates noted that there was no clear organization and coordination and that there was no specific actor to which the government could point that the defendant had aided and abetted.

Judge Nichols applied the physical contact enhancement in *United States v. Doolin*, 21-cr-447.   But there, the defendant stole one of the Capitol Police shields and used it in a "coordinated effort to break through a police line." *Id.,*, ECF No. 252 at 39-40.   As the government notes, Judge Nichols also applied the enhancement in *Kumer*. But the government fails to mention that the defense conceded the applicability of 2A2.4(b)(1) with the plea agreement.[2]   ECF No. 103 at 2.   Within the agreement, the defense also conceded that it had "used violence or credible threats of violence in connection with the offense and/or the offense resulted in serious bodily injury."   *Id.,* ECF No. 103 at 3.

The government's reliance upon *United States v. Crowley*, 23-cr-45, is similarly distinguishable.   Crowley "push[ed] against the riot shield of [an officer] and was pepper sprayed at least seven times before being ejected.   *Id*. ECF No. 130 at 2-3.

---

[2] This concession was likely motivated by evidence that Mr. Kumer called out "Let's go!   C'mon!   Let's go! To the rioters around them to encourage them to join the push against the police."   *United States v. Kumer¸*23-cr-237, ECF No. 104 at 4.   The government's confusion may come from the defense reserving the right to litigate the applicability of 2A2.4(b)(2), as to whether the defendant caused the injury of a Capitol Police Officer.

He then reentered the tunnel twice more and was close enough to the front to be sprayed again. *Id.*

These opinions reject equating the behavior of an individual in the back of a group to the individuals in the front of that group, without more.   Notably, Mr. Baer never yelled "Heave Ho!"   He never chanted anything or encouraged anyone to do anything while in the tunnel.   He did not act in coordination with anyone.   He was near the very rear of the group that was in the tunnel.   The government can point to no evidence that his intent was to harm or obstruct the police physically.   In fact, he berated one individual that was doing harm to officers by throwing a firecracker and assisted another police officer who had been pulled out from the tunnel.   Indeed, the government cannot prove that Mr. Baer even knew what was happening at the front of the line until the point where he reached the front of the line (and soon thereafter, left). He did not engage in any such conduct after he moved forward into the tunnel and saw the officers up close – indeed, he left the grounds shortly thereafter.

### C. The Zero-Point Offender reduction should apply.

Notwithstanding the Court's ruling on the applicability of 2A2.4, the Zero-Point Offender reduction should also apply to Mr. Baer, who has never had any interaction with the criminal justice system.   In short, the zero-point offender reduction applies because the exception for "using violence or credible threats of violence" does not apply to Mr. Baer's conduct.

The government opposes the two-level reduction because it alleges that Mr.

Baer "used violence or credible threats of violence in connection with the offense." ECF No. 57 at 17.   But Mr. Baer, without question, did not himself engage in violence or threaten violence in this case.

The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within § 4C1.1 or its commentary.   And when no definitions are provided, courts look to dictionary definitions to determine meaning.   *See Kaufman v. Nielsen*, 896 F.3d 475, 485-87 (D.C. Cir. 2018).   Courts in this district have issued several opinions discussing dictionary definitions of violence when considering § 4C1.1 and found that violence is "'[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse."   *Bauer*, 2024 WL 324234, at *2 (*quoting* Violence, Black's Law Dictionary (11th ed. 2019), and Violence, Webster's Third New International Dictionary (1993)); *see also United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar); *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (D.D.C. Jan. 31, 2024) (similar). There is no evidence that Mr. Baer had any fury or vehemence, nor did he exert force as to injure or abuse or intended to injure or abuse.

Courts in this district to have addressed the issue have found that § 4C1.1(a)(3)'s violence factor requires the defendant to have *personally* used violence or made credible threats of violence to be disqualified; it is simply not enough that

Mr. Baer was part of a group where *others* engaged in violence or made credible threats of violence.   *See, e.g.*, *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) after finding the "inquiry turns on the actions of the defendant himself or herself, not the actions of others," and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg).

Judge Bates' decision in *Yang* is instructive.   There, Mr. Yang "stood near the front of the crowd close to the police line" in the Rotunda.   *Yang*, 2024 WL 519962, at *1.   While Mr. Yang's "body language was generally nonconfrontational," he made "physical contact with officers twice."   *Id.*   First, "[w]hen a scuffle broke out nearby . . . Yang briefly grabbed an officer's wrist."   *Id.* Second, "[w]hen an officer approached from the side and pushed [another rioter] firmly with a baton, Yang . . . briefly grabbed the baton as [the other rioter] fell backward."   *Id.*[3]

---

[3]  According to the government's sentencing memorandum, "When police officers formed a line to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead, obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and when another officer pushed Yang towards the exit, Yang confronted the officer and waved his hand in his face instead of leaving. He remained near the advancing police line, and when an officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S. Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes."   *Yang*, No. 23-cr-100, ECF No. 34 at 2.

The government included the following still photographs in its sentencing memorandum, ECF No. 34 at 11:



Image 8: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.



Image 9: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.

The government further represented that Mr. Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers," *id.* at 12:



Image 10: Still from Government Exhibit 1 Showing Yang Pushing Officers Working to
Expel Rioters from the Rotunda at Approximately 3:08:56 p.m.

Judge Bates concluded that Mr. Yang's actions did not constitute "violence"
within the meaning of § 4C1.1.   *Yang*, 2024 WL 519962, at *4.   While Mr. Yang
may have used physical force in that "he briefly made physical contact with two
officers, the Court [found] that this contact was not made with an intent to harm."
*Id.*   "Nor was this contact accompanied by 'fury, vehemence, or outrage,' or the
like."   *Id.*   As the Court explained, "[t]he throughline of the definitions of 'violence'
is a degree of aggressiveness that [wa]s not present in th[at] case."   *Id.*   And, even
though Mr. Yang was "near the front of the line opposing the line of officers," and
twice made physical contact with officers, the Court concluded that "Yang did not
act with the degree of aggression necessary to fairly characterize his actions as
'violence.'"   *Id.*

The same reasoning applies with even more force here.   When viewing Mr. Baer's own conduct on January 6, he did not use "violence" as that term is properly understood.   Mr. Baer did not punch, kick, grab, or throw any objects at law enforcement officers—indeed, he did not even physically contact any officer.   At no point did he damage property, threaten others, yell at anyone, or encourage others to use violence or even to push forward.   Given the indisputable fact that Mr. Baer did not engage in any acts of violence, the government appears to be advocating for a January 6th exception to the Guideline amendment.

Finally, even if the Court decides to apply the "physical contact" enhancement, the plain text of that provision is far broader than § 4C1.1(a)(3): whereas § 2A2.4(b)(1) applies if "the *offense involved* physical contact," §4C1.1(a)(3)'s violence provision applies only if "*the defendant . . . use[d]* violence or credible threats of violence."   The contrast between these provisions' subjects (*i.e.*, "defendant" versus "offense") and the operative verbs ("use" versus "involves" or "results") makes clear that the inquiry of § 4C1.1(a)(3) "turns on the actions of the defendant himself or herself," unlike § 2A2.4(b)(1) which theoretically can consider "the actions of others."   *See Yang*, 2024 WL 519962, at *4 (D.D.C Feb. 9, 2024); *cf. United States v. Hernandez-Barajas*, 71 F.4th 1104, 1106-07 (8th Cir. 2023) (interpreting similarly-worded threats provision in U.S.S.G. § 2D1.1(b)(2) and concluding that the "sentence's subject, the doer of the action, is the defendant" and that "[g]rammatically speaking, the defendant is the one who must make the

credible threat, even if it involves the potential use of violence by someone else"); *see also* U.S.S.G. § 2J1.2(b)(2) (applying 3-point enhancement if "the *offense resulted* in substantial interference with the administration of justice"); *see also United States v. Hernandez*, No. 21-cr-455 (CKK), ECF No. 65 at 4 (D.D.C. Jan. 31, 2024) (finding an argument based on the "2J1.2(b)(1)(B) enhancement . . . not persuasive because it is not focused on Defendant's conduct, which is the relevant inquiry" under 4C1.1).

## II.    Application of the Sentencing Factors

### A. Mr. Baer's history and characteristics demonstrate that a sentence short of incarceration is appropriate.

*"I feel terrible about what happened to that officer.    I did wrong and I deeply regret that anyone was hurt that day."   - Nathan Baer*

From January 7, 2021, Nathan Baer has been a poster child for January 6th within popular culture.   From that day, he has lived in shame.   Everything that he had done in his life, his good moral character, his willingness to volunteer for the elderly, the helping hand he always provided – none of that mattered anymore.

The true story about Mr. Baer is one of the more confusing of January 6th. He is a trained opera-singer, a devout Christian, an owner of a small business and a man universally described by his community as kind and law-abiding.   He came to January 6th because he believed, like millions others, that there were irregularities with the presidential election and he wanted to protest on behalf of President Trump.   But he never knew what would happen when he arrived.

13

It is most important to Mr. Baer, that the Court understands that he would never hurt anyone and that he never wanted any harm done to any person, much less a police officer.   He wandered into the tunnel out of curiosity, but also to try and help those who were sprayed in the face.   When he saw the crowd lose control, his first instinct was to remain and assist those being pushed back and sprayed – not because he wanted to help them in their cause – but because there were women and older people there who seemed to him vulnerable.

Counsel acknowledges that Mr. Baer's accounts may sound like minimization.   But insight into Mr. Baer's life demonstrates that this is truly the person he is. Mr. Baer is no ordinary January 6th defendant.   The letters written from his community describe a devotedly selfless individual who goes out of his way to help those suffering around him.   Several people mention his volunteer work for senior citizens, so much so that he became, in essence, a hospice worker for three individuals in need of help as they embarked upon the ends of their lives.   He is often revered for his compassion and his willingness to help those around him – even those he did not know well.   It is within this context that Mr. Baer entered the tunnel – looking to see if anyone needed help.   It is within this context also, that it is entirely credible that Mr. Baer passed shields back to the police line intending to pass them to the officers – not the rioters who were trying to push through (it is noteworthy that he did not help pass riot shields away from the officers towards other rioters).

14

And he did help.   While he certainly leaned up against rioters and applied force, his goal was not to push or hurt police.   He does not recall exactly what he was thinking in every moment, but he does recall confusion from the actions of the officers and the rioters and his uncertainty that those getting tear-gassed deserved it.   But the wrongness of the others around him became much clearer for him as the minutes passed in the tunnel.   He recalls helping one older woman who had teargas in her eyes.   He also knew to condemn people like David Judd, who threw the firecracker and ran away.   Exh. C.   Mr. Baer's outrage at Mr. Judd's actions was even described in the government's sentencing memorandum in that case.   He also knew when he saw a police officer looking "terrified" that it was important to do whatever he can to help him. Exh. D.   He can be heard telling Officer Fanone that he would be ok.   Mr. Baer deeply regrets being part of the group that harmed police officers but unlike so many defendants, his regret was immediate.   He did what he could to help and he left the grounds.

Moreover, Mr. Baer has always been a law-abiding citizen.   He attended college for music and became an opera singer. https://www.youtube.com/watch?v=oOzdxebyoyE.   His career was derailed by medical issues with his throat – combined with the pandemic, he admits he became somewhat unmoored. He has always been a person who sought purpose and prided himself in his willingness to serve others without limitation.   He is well-loved and respected by those in his personal life and his work life.

15

Mr. Baer also suffers from medical conditions that are relevant to the Court's consideration.   He has cardiac problems in the form of a bicuspid aortic valve.   It is a genetic condition that has taken his older brother's life and that has required surgery for his father and two brothers.   He also has defects in his sinuses that have twice required surgery.   He also suffers from ruptured discs in the back of his neck, caused by physical trauma from a construction accident in 2016. These conditions can surface at any time and have serious repercussions.

**B. The nature and circumstances of Mr. Baer's offense do not warrant a significant prison sentence.**

Mr. Baer was part of one of the worst moments of American history when he entered the Capitol grounds.   However, he did not plan for violence and did not engage in violence. He had no weapons or body armor when he came to the District. He did not use social media to publicly brag about his actions.   He did not attempt to destroy evidence.   He never entered the building.   Although he acknowledges that he at times yelled U.S.A., he had no intention of threatening, intimidating or assaulting officers.

**C.   A Period of incarceration is not appropriate for Mr. Baer**

A period of home detention is appropriate for Mr. Baer.   For most of his time on the Capitol grounds, Mr. Baer demonstrated an unwillingness to get "caught up" as so many January 6th defendants had.   He scolded those who were acting in a dangerous manner; tried to assist an officer who was being attacked and never entered the building.   Within the spectrum of offenders for January 6th,

16

particularly given the unselfish and admirable contributions to his community, Mr.
Baer's sentence should not include incarceration.

District judges have recognized the life-long, damaging impact of a felony
conviction can be relevant to sentencing. For example, in another January 6 case,
the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real
> punishment is a jail sentence, and it's just not true. People can
> suffer in many different ways and do suffer in many different
> ways a result of their conduct and that is something every judge,
> at least on this court, I believe, understands, and takes into
> account when they're fashioning the appropriate sentence.[4]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block
of the Eastern District of New York issued a written opinion on the relevance of
collateral consequences to his sentencing determination and urged that judges
"consider such consequences in rendering a lawful sentence." *United States v.
Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no
> useful function other than to further punish criminal defendants
> after they have completed their court-imposed sentences.
> Many—under both federal and state law—attach automatically
> upon a defendant's conviction. The effects of these collateral
> consequences can be devastating. … Myriad laws, rules, and
> regulations operate to discriminate against ex-offenders and
> effectively prevent their reintegration into the mainstream
> society and economy. These restrictions amount to a form of civil
> death and send the unequivocal message that "they" are no
> longer part of "us."

---

[4] *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

188 F. Supp. at 3d at 179 (internal quotations, alterations, and citations omitted).

In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in

severity of punishments do not yield significant (if any) marginal deterrent effects."[5] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Baer or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

### D. A sentence of time-served avoids unwarranted disparities.

Mr. Baer did not assault or injure anyone. He did not enter the building.   He

---

[5] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.   Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

demonstrated through his actions his mindset and his intent.   He was not at January 6th to overthrow an election, invade the Capitol, to fight with police or to riot.   He was there to protest and left, too late, when he realized it for what it was. While he recognizes that his actions in general that day were reckless, he drew important lines that he did not cross.   A prison sentence that will remove Mr. Baer from his business, his contracts and his community is not warranted and will create disparity with other cases involving similar conduct.

Many have now been sentenced for their conduct on January 6th and it is helpful to consider the sentences for some of the egregious conduct that occurred that day.   For example, in *United States v. Matthew Wood*, 21-cr-223 (APM), Judge Mehta sentenced the defendant to probation despite actions in a different ballpark from Mr. Baer.

Mr. Wood pleaded guilty to all charges in the Indictment of which the lead charge was 18 U.S.C. § 1512(c)(1). The government requested a sentence of 57 months based on its guidelines calculation of 51 to 63 months. Gov. Sentencing Memo, ECF. No. 55 at 47.

Wood boasted about fighting police and "storming" the Capitol in messages to others such as: "We sent congress running into their escape tunnels," and "We just stormed the Capitol, we are busting into house chambers," "We busted the windows out." Wood falsely told a friend, "I am fighting capitol police." According to the government, Wood was also part of a group that "terrorized" staffers present in

House Speaker's suite of offices."[6] Ultimately, Judge Mehta imposed a sentence of one year of home detention.

Mr. Wood's conduct far surpasses an objective description of Mr. Baer's.   It is beyond dispute that vulnerable individuals like Mr. Baer had been fed lies by the President of the United States (and other powerful people) arguing that democracy was at stake, that their vote had been stolen, and that it was up to them to stand up for the "true President."[7]  But unlike Mr. Baer, Mr. Wood did much more, for example:

- Prior to January 6, Mr. Wood, unlike Mr. Baer, made blustering comments about January 6. Specifically, Mr. Wood messaged comments such as January 6 "is going to be wild" and that he was "down for whatever they want to do!" He also boasted that he was prepared to "raid Congress" and "be brave heart in that bitch."[8]

- Mr. Wood climbed the media tower and "encouraged others forward." According to the government, he incited others to violence.[9]

---

[6] ECF. No. 55 at 51.

[7] According to Representative Liz Cheney, Vice Chair of the House Select Committee investigating January 6,"President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committeehearing-transcript.

[8] Id. at 1-3.

[9] ECF. No. 55 at 3.

- Unlike Mr. Baer, Mr. Wood entered the Capitol building.   Mr. Wood also entered through a broken window.[10] He pursued police officers, including Officer Eugene Goodman upstairs to the Ohio Clock corridor.

- Mr. Wood went from the Ohio Clock corridor to the Chamber of Congress and similarly told others that he and "just broke through Capitol police" (among other blustery comments).

- According to the government, Mr. Wood pushed against police officers. Mr. Baer did not make physical contact with officers.

- Wood was in the Capitol for a total of 80 minutes.[11]  Mr. Baer never entered.

- Mr. Wood deleted his Facebook account after January 6 and urged an individual whom he has messaged to delete their conversation. Mr. Baer never posted on social media.

- Mr. Wood entered the Speaker's suite and took video of his antics there, including taking a drink of water from a glass sitting on a table. According to the government, he was part of a group that "terrorized" the staffers in the Speaker's suite.[12]  Video captures Wood yelling, "Madam Speaker, we want to have a word with you!" and "Here's Johnny!." Mr. Clark did not enter the Speaker's suite or any private areas of Congresspersons.

---

[10] Id. at 4
[11] Id. at 4
[12] Id. at 28

- Mr. Wood made his way to the Rotunda, where police officers began forcing people to leave. He refused to leave and instead assisted other protestors pushing against police.[13]

- After January 6, Mr. Wood uploaded his pictures to social media with messages such as "We sent those politicians running."[14]   Mr. Clark did not post on social media.

- Like Mr. Baer, Mr. Wood did not bring weapons, though he boasted of using "guns" in his messages.

For this conduct, Judge Mehta imposed no prison time.

Recently, in *United States v. Jackson*, No. 22-cr-230, this Court sentenced Mr. Jackson to "36 months of Probation with conditions," *see* Min. Entry (Mar. 21, 2024) (emphasis added), even though his conduct was assaultive and far more violent than Mr. Baer's.  According to the government's sentencing memorandum, Mr. Jackson was near the tunnel of the Capitol where he "hurled a large cone at the officers" and then, "using a stolen police shield, and with a running start, he rammed the frontline of officers, causing two of them to fall."  ECF No. 80 at 2; *see also id.* at 12-15 (showing images of the clash); *see also* Statement of Offense, ECF No. 61 at 4 (similar).  Mr. Jackson was charged with six counts, including assaulting an officer using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b), civil disorder in violation of § 231(a)(3), among

---

[13] Id. at 38.
[14] Id. at 55.

other violent offenses, *see* ECF No. 14, but he ultimately pled guilty to a single count of assaulting a police officer in violation of § 111(a)(1),  ECF No. 60.  Demonstrating that Mr. Jackson's violent and assaultive conduct was more egregious than Mr. Doolin's is the fact that the government recommended 41 months' imprisonment at sentencing, *see* ECF No. 80 at 1, unlike the 11 months recommended here.  Even so, Mr. Jackson was sentenced to 36 months' probation with conditions.

In *United States v. Young*, No. 21-cr-617, Judge Friedrich sentenced Mr. Young to 8 months' incarceration after he pled guilty to seven counts: (1) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (2) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (3) entering and remaining in a restricting building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) engaging in physical violence in a restricting building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (6) disorderly conduct in a Capitol Building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and (7) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).  *See* Judgment, ECF No. 38.  Mr. Young's conduct was worse than Mr. Baer's.  According to the government's sentencing memorandum, Mr. Young was one of several rioters who "lifted and pushed a metal bicycle rack barricade into a wall of officers" and later "attacked another line of officers in the same location."  ECF No. 35 at 2.  In addition to assaulting officers, Mr. Young tried to "sabotage law enforcement" by letting "the air out of the tire of a government vehicle."  *See id.* sentencing, unlike the 24 months here.  *See id.*  Even so,

24

Mr. Young received a sentence of 8 months' incarceration, whereas the government is requesting a greater sentence for Mr. Baer

In *United States v. Wren*, No. 21-cr-599, Judge Walton sentenced Mr. Wren to 12 months and 1 day after he was found guilty by a jury of three offenses: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); assault on a federal officer, in violation of 18 U.S.C. 111(a)(1); and (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). *See* Verdict, ECF No. 117; Judgment, ECF No. 173. Mr. Wren's conduct was worse than Mr. Baer's, as he "assault[ed] a line of police officers attempting to clear the Upper West Terrace so that the electoral certification could continue." *See* Gov't Sent'g Mem., ECF No. 158 at 2. Indeed, the government requested 51 months' imprisonment at sentencing, demonstrating that the government viewed Mr. Wren as more culpable than Mr. Baer. Even so, Mr. Wren received a sentence of 12 months and 1 day.

In *United States v. Crowley*, No. 23-cr-45, Judge McFadden sentenced Mr. Crowley to 8 months' incarceration, and 6 months of home confinement as a condition of supervised release. *See* Judgment, ECF No. 141. Like Mr. Baer, Crowley joined the group of rioters in the tunnel—except Mr. Crowley's conduct was worse given that he persisted in the tunnel "[d]espite being pepper sprayed at least  seven times" and "push[ed] against the riot shield of MPD Officer Henry Foulds." *See* Gov't Sent'g Mem, ECF No. 130 at 2-3.

In *United States v. Leffingwell*, No. 21-cr-05, Judge Jackson sentenced Mr. Leffingwell to 6 months' incarceration.   Mr. Leffingwell's conduct was unquestionably

worse than Mr. Baer, as he "struck [multiple officers] in the head." *See* Gov't Sen't

Mem., ECF No. 31 at 3, 8.  Specifically, according to the government's sentencing

memorandum, Mr. Leffingwell was a 52-year-old veteran who "first punched Officer

D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the

head, before eventually punching Officer D.A. once more."  ECF No. 31 at 3, 8.  As a

consequence, he was charged with civil disorder, two counts of assaulting an officer, and

several other counts for violent offenses. *See* Superseding Indictment, ECF No. 15.

Mr. Leffingwell ultimately pled guilty to a single count of assaulting an officer, in

violation of 18 U.S.C. § 111(a)(1). *See* Plea Agreement, ECF No. 25.  Despite Mr.

Leffingwell's exceptional assaultive conduct, he received a sentence of 6 months'

incarceration.

In *United States v. Grayson Sherrill*, No. 21-cr-282, Judge Chutkan sentenced

Mr. Sherrill to 7 months' incarceration, *see* ECF No. 129, even though his conduct was

far more violent and assaultive than Mr. Baer's.  According to the government's

sentencing memorandum, "Sherrill violently swung and struck [a vulnerable] officer

with a metal pole." ECF No. 124 at 2, 6. Mr. Sherrill was charged with eight counts,

including assaulting an officer using a dangerous weapon in violation of 18 U.S.C. §

111(a)(1) and (b), civil disorder in violation of § 231(a)(3), among other violent offenses, *see*

ECF No. 57, but he ultimately pled guilty to a single count of assaulting a police officer

in violation of § 111(a)(1), ECF No. 105.

Finally, in *United States v. Steele*, 21-cr-28, Judge Mehta sentenced Ms. Steele to

12 months and 1 day of imprisonment and 6 months of home detention as a condition of supervised release, after she was convicted in a jury trial of seven counts, including (1) conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); (2) obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; (3) conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372; (4) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C.§ 1752(a)(1); (5) destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2; (6) civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2; and (7) tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1).  There can be no question that her conduct was far worse than Mr. Baer's.

According to the government's sentencing memorandum, Ms. Steele drove from her "residence to the D.C. area with two handguns" and "eventually equipped herself with an Oath Keepers shirt, tactical vest, and other gear," before she "joined the stack of Oath Keepers that breached the Capitol."  *See* ECF No. 1024 at 53.  She "confronted and pushed against police officers" and after returning to her residence "promptly burned all of [her] gear [she] wore inside the Capitol" to "destroy the trail of evidence of what [she] had participated in."  *Id.* at 53. The government described her as "arguably the most culpable" of all her co-defendants.  *Id.* at 51. The government recommended a sentence within the range of 97 to 121 months' incarceration (versus 11

months  recommended here). *See id.* at 1, 47. In the end, Judge Mehta imposed an imprisonment sentence of 12 months and 1 day, plus 6 months home detention as a condition of supervised release.[8]

Mr. Baer committed a crime on January 6th and should be punished accordingly.   But the District Court's history of sentences for offenses from that day require a sentence short of incarceration. Incarceration has primarily been reserved for those who committed some act of violence or disrespected the Capitol or its police, or tried to interfere with Congress' actions.   Mr. Baer did none of those things.   And while he certainly regrets his conduct within the tunnel, it is truly exceptional that he also tried to do something good within that time.   That is consistent with Mr. Baer's nature and history.

## Conclusion

Mr. Baer thus respectfully requests that this Court sentence him to a period of thirty days of home detention.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004

(202) 208-7500
Eugene_ohm@fd.org